**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re Application of

*Yves Bouvier*

for an Order Pursuant to 28 U.S.C. § 1782 to
Conduct Discovery for Use in Foreign Proceedings

Case No. 25 Misc. 549 (VSB)

---

I, the undersigned, Yves Bouvier, under oath and penalty of perjury, pursuant to 28 U.S.C. § 1746, declare the following:

1.  The Declaration of Mr. Peretti (DE#38) is inconsistent with his own prior sworn testimony, and with the economic reality of the transactions.

2.  I met Jean-Marc Peretti (JMP) in 2006–2007. When he moved to Geneva, Switzerland, in 2009, I supported him, both personally and professionally, by founding the company Nelombos on his behalf. I also introduced him to my professional network and the art world.

3.  The group I led was among the world's leading logistics providers for works of art, as was my group of companies, specialized in the purchase and sale of art. I entrusted JMP with several assignments through the company Nelombos, which I financially supported, particularly in connection with art sales.

4.  JMP introduced me to Pascal de Sarthe around 2009-2010, and we became friends. On the professional side, I entered into several transactions in 2009-2010 with Milocci Limited, M. de Sarthe's company.

5.  In 2015, due to the media coverage of the Rybolovlev affair (for which there has been no conviction in any of the jurisdictions involved), my business activities were affected. Contrary to what JMP claims, I was not imprisoned[1]. I was detained by the Monaco police on



February 25, 2015, and remained at the police station in custody until February 28, 2015.
Immediately after, I returned to Geneva to meet with JMP. We met at my home to discuss
measures to protect and preserve my art collection. In light of the ongoing legal proceedings,
JMP suggested that I entrust my artworks to Mr. de Sarthe during that period. Trusting both JMP
and Mr. de Sarthe, I agreed in principle.

6.   It was orally agreed that the profit margin would be allocated as follows: 50% to
JMP and Mr. de Sarthe, who would determine the internal distribution between themselves, and
50% to me; in the event of a sale, the proceeds would be reinvested in works of art. As explained
in my prior sworn declaration (DE#25-1), the 50–50 profit-sharing agreement was oral, but it is
common practice for dealers to rely on *pro forma* invoices for artworks and to split the profit
50–50 upon sale. From 2009 to 2015, all agreements between JMP, Mr. de Sarthe, and I were
exclusively oral.

7.   On December 1, 2022, in the context of criminal proceedings in Geneva, JMP,
under oath and assisted by his attorney, was questioned by the prosecutor about the exact nature
of our professional relationship. (Exhibit 1, pp. 2–3.)

8.   He expressly declared :

- that he acted as a "business introducer" for me;
- that some artworks were entrusted to him for sale;
- that he could sell paintings on my behalf;

---

[1] By comparison, the credibility of JMP's testimony regarding the ownership of assets and financial flows can be assessed in light of his judicial record. In 2025, he was criminally convicted in France and sentenced to five years in prison and a €750,000 fine for money laundering, extortion, and criminal conspiracy. "Peretti disappeared this year before he was sentenced to jail in France for links to organised crime… Peretti was sentenced to five years in jail in his absence in May and fined €750,000 for money laundering, extortion and racketeering linked to the Petit Bar organised crime group in Corsica." https://www.thetimes.com/uk/crime/article/mayfair-art-dealer-named-in-hunt-for-lost-100m-collection-nvrbt2rpb?gaa_at=eafs&gaa_n=AWEtsqfUcilC2rnyorT_6wixp9DhOwZpOQ0Tx2cKiCJduJNKEm5pGWlUoslNZGPPJsY%3D&gaa_ts=698bf399&gaa_sig=lnzc3sbLS3RfrfltrbTnd2Fu_bERXuDbEWMWSxuxSDcje7btZ4Pqrr5TlG8hfoCumuu6elTUDbiuEv_FCXyfNQ%3D%3D

- that he merely gave his opinion on the artworks;
- that our relationship was "amicable";
- and that it had never been formalized in writing.

9.  He never claimed to be the owner of the artworks, nor did he claim that I held any artworks in trust on his behalf.

10. This description corresponds exactly to the role of a commission-based intermediary, which is common practice in the art market.

11. JMP's sworn testimony is inconsistent with the position he now takes, namely that he allegedly acquired the artworks with his own funds and that I acted as his fiduciary.

12. All the artworks were acquired and invoiced to my companies on my behalf. Furthermore, I never acted as a fiduciary for JMP. Had I acted as a fiduciary, JMP would have been required to produce the trust agreement and to pay fiduciary fees to my service company. This is a requirement in Switzerland.

13. Furthermore, JMP 's sons, Antoine and Ryan, as well as Mr. George de Bartha, are associated with the professional activities of JMP. Ryan Peretti operates Ryan SA, a company domiciled in Nélombos, of which JMP is the director (Exhibit 2). Ryan Peretti also received a substantial commission from JMP for the purchase of a work inspired by the artist Yves Klein

14. For his part, Antoine is his father's nominee for his company, Atlantide Limited London. Antoine is not an art professional, and his activity in the art trade is primarily on behalf of his father. In the context of a significant transaction between Antoine and me, Antoine was acting on JMP's instructions[2].

---

[2] I have at the court's disposal a copy of these phone messages from Antoine:
My text to Antoine on November 21, 2024:
*"I understand that your father is your principal, but let's settle the transaction between you and me regarding this Picasso work."*
Antoine's response on November 22, 2024:

15. Finally, George de Bartha is a nominee of JMP closely connected to JMP's companies. For example, entities represented by George de Bartha were inserted into the consignment chain by JMP through successive contractual substitutions (Exhibit 3).

I certify under penalty of perjury, pursuant to the laws of the United States of America, that the foregoing statements are true and correct.

Dated: February 11, 2026

Yves Bouvier

---

*"You understand that I have to check with him first... I also have no intention of interfering in your relationship, as it's none of my business, even though I like you and know that you have always supported my father. I'll keep you informed when I have news."*