**EXHIBIT 1**

**EXCERPT OF THE MINUTES OF HEARING**



REPUBLIQUE ET CANTON DE GENEVE
Pouvoir judiciaire
**Ministère public**

Genève, bâtiment du Ministère public
le 1ᵉʳ décembre 2022 à 8 heures 40

**Greffière-juriste** : Caroline FRÖSCH-DELADOEY

**Greffier** : Marc BERCLAZ

| Réf : | P/15776/2017 |
|---|---|
| à rappeler lors de toute communication. | |

## PROCES-VERBAL D'AUDIENCE

Sur avis d'audience se présentent:

**ACCENT DELIGHT INTERNATIONAL LTD,**
**BOLTON TRUSTEES LTD,**
**EGEUS INVESTMENTS CORP.,**
**HOOVER TRADING INVESTMENTS LTD,**
**JOLLY TIMES INCORPORATED**
**TALASEA LTD,**
**TREEHOUSE CAPITAL INC.,**
**XITRANS FINANCE LTD,**
Partie plaignante, avisées, absentes,
Représentées par Mes Sandrine GIROUD et Benoît MAURON, accompagnés de Me Nikita OGNIVTSEV;

Sur mandat de comparution se présentent:

**Monsieur Yves BOUVIER,**
Identité connue et vérifiée,
Prévenu, déjà entendu, rendu attentif à ses droits et devoirs,
Assisté par Me David BITTON, accompagné de Me Edouard KAIFLIN;

**Madame Tania RAPPO,**
Identité connue et vérifiée,
Prévenue, absente, excusée,
Représentée par Me Pierre-Damien EGGLY;

**Monsieur Jean-Marc PERETTI,**
Né le ▮▮▮▮ 1965, marchand d'art,
Personne appelée à donner des renseignement, rendu attentif à ses droits et devoirs,
Assisté par Me Didier BOTTGE;

Vous nous informez que l'audience de ce jour vous a été déléguée par le Premier Procureur Yves BERTOSSA, en application des articles 142 al. 1, 311 al. 1 CPP et 21 LaCP

Procès-verbal d'audience du Ministère public du 1er décembre 2022
page 2

## M. BOUVIER

Je prends note je suis entendu en qualité de prévenu.

Vous m'informez que j'ai le droit de refuser de déposer et de collaborer. Vous me donnez connaissance de mes droits au sens des articles 107 et 158 CPP.

## M. PERETTI

Je prends note que je suis entendu en qualité de personne appelée à donner des renseignements.

Vous m'informez que j'ai le droit de refuser de déposer.

Vous me rendez attentif aux conséquences pénales possibles d'une dénonciation calomnieuse, d'une déclaration induisant la justice en erreur ou d'une entrave à l'action pénale (art. 303 à 305 CP).

Vous me donnez connaissance de mes droits au sens de l'article 158 al. 1 let. b, c et d CPP.

Me Didier BOTTGE m'assiste dans le cadre de la présente procédure. Election de domicile est faite en son étude, y compris pour l'envoi des mandats de comparution.

**Confirmez-vous vos déclarations à la police genevoise du 12 mars 2015 (pièce 1 annexée au pv)?**

Oui, je m'en souviens et je confirme mes déclarations faites à cette occasion.

**Quelle est votre situation professionnelle actuelle ?**

Je suis toujours marchand d'art.

Je travaille toujours avec ma société NELEMBOS SA.

**Quand et dans quelles circonstances avez-vous fait la connaissance de Yves BOUVIER ?**

J'ai rencontré Yves BOUVIER en 2007, il me semble, dans le quartier de Saint-Germain des Prés à Paris dans le contexte de l'art. Nous fréquentions les mêmes personnes.

Nous sommes devenus amis. Je signale que M. BOUVIER était une personne connue et appréciée dans le monde de l'art.

**Quand et à quelles occasions précisément avez-vous travaillé avec ou pour Yves BOUVIER ?**

Oui. J'ai eu l'occasion de travailler avec Yves BOUVIER à plusieurs reprises pour quelques tableaux. C'était au cas par cas. Nous n'étions pas associés.

**Avez-vous vendu des œuvres d'art à Yves BOUVIER ou avez-vous agi comme intermédiaire/apporteur d'affaires pour ce dernier ?**

Il me semble avoir agi pour M. Yves BOUVIER en qualité d'apporteur d'affaires pour des tableaux qui m'étaient confié à la vente. Il est possible également que j'ai également vendu des tableaux pour lui. J'ai également eu l'occasion de donner mon avis sur de nombreuses œuvres d'art.

P/15776/2017

Procès-verbal d'audience du Ministère public du 1er décembre 2022
page 3

Sur question, je précise que je lui donnais mon avis quant à la qualité des œuvres. M. BOUVIER n'était pas souvent en Europe. Je connaissais un peu ses goûts. Je lui cherchais des œuvres. J'ai eu ces activités approximativement entre 2011 et 2015 jusqu'à l'histoire avec M. RYBOLOVLEV.

**Votre relation a-t-elle été formalisée par écrit ?**

Non. Il s'agissait d'une relation amicale.

**Avez-vous été rémunéré par Yves BOUVIER ?**

Oui. Je n'ai jamais été rémunéré de manière fixe. Parfois, j'avais une commission. Parfois, il s'agissait d'un échange de bons procédés. Cela m'a permis de rentrer plus rapidement dans le monde de l'art à un certain niveau. Je précise, s'agissant de cette dernière phrase, que de connaître Yves BOUVIER était une carte de visite dans la mesure où ce dernier était une référence dans le domaine de l'art.

**En 2015, vous avez déclaré avoir reçu des cadeaux d'Yves BOUVIER, notamment une ASTON MARTIN. Ce véhicule a-t-il été le seul cadeau qu'Yves BOUVIER vous ait offert ou y en a-t-il eu d'autres? Pouvez-vous détaillé les cadeaux reçus, à quelle date et pour quelle occasion?**

Il me semble que ce véhicule est le seul cadeau que j'ai reçu de M. Yves BOUVIER.

Sur question, les commissions que j'ai reçues d'Yves BOUVIER ont été versés sur le compte de ma société.

**Avez-vous des intérêts dans les sociétés de Yves BOUVIER?**

Aucun. Je rectifie. J'ai eu des intérêts dans la société EUROCENTER qui n'est pas active dans l'art.

**Avez-vous fait la connaissance de Dmitriy RYBOLOVEV, le cas échéant quand et dans quelles circonstances ?**

Jamais. Je ne sais pas qui c'est.

**Avez-vous fait la connaissance de Mikhael SAZONOV, le cas échéant quand et dans quelles circonstances ?**

Non plus.

**Avez-vous fait la connaissance de Tania RAPPO, le cas échéant quand et dans quelles circonstances ?**

Non plus.

Sur question, M. BOUVIER ne m'a jamais parlé de ces 3 personnes. J'ai entendu parler de ces dernières dans la presse. Je précise que lorsque je dis qu'il ne m'en a pas parlé, qu'il n'est pas rentré dans les détails. Je savais qu'il connaissait M. RYBOLOVLEV, mais je ne savais pas ce qu'il faisait avec ce dernier, cela ne m'intéressait pas.

**Avez-vous fait la connaissance de Samuel VALETTE, le cas échéant quand et dans quelles circonstances ?**

Oui. Je le connais depuis longtemps. Depuis 2006 ou 2007. Je sais qu'il travaille chez SOTHEBY'S en tant que marchand d'art. C'est normal que je le connaisse.

P/15776/2017

Sur question, il ne m'a pas été présenté par Yves BOUVIER.

Sur question, je l'ai rencontré lors des ventes. Il travaillait à Paris et j'étais également à Paris à l'époque.

**Que savez-vous de l'activité d'Yves BOUVIER en lien avec l'acquisition d'œuvres d'art par Dmitriy RYBOLOVLEV ?**

Je ne sais rien de la part de M. BOUVIER. Cela ne m'intéresse pas. Ce que j'en sais, je l'ai appris dans la presse.

**De manière générale, à votre connaissance, en quelle qualité M. BOUVIER interagissait dans le monde de l'art ?**

A ma connaissance, en qualité de marchand d'art et de logisticien.

**Êtes-vous intervenu dans le processus d'acquisitions d'œuvres d'art par Dmitriy RYBOLOVLEV, le cas échéant en quelle qualité ?**

Encore une fois, je vous répète que je n'ai aucune connaissance des activités en lien avec M. RYBOLOVLEV. J'ai toujours interagi uniquement avec M. BOUVIER.

**Quel a été votre rôle dans l'acquisition de "L'éternel printemps (marbre)", d'Auguste RODIN par BIANCAFLOR puis par ACCENT en juin et juillet 2011 ?**

Je connais cette œuvre. Il s'agit d'un marbre il me semble. Je ne me souviens plus exactement si j'ai eu une activité en lien avec cette œuvre. Il est possible que j'ai donné un avis.


**Note de la Greffière-juriste :**

Me BOTTGE indique que M. PERETTI a déjà été longuement interrogé le 2 mai 2022 dans le cadre d'une commission rogatoire civile américaine dans le cadre d'un procès opposant les plaignantes à SOTHEBY'S. Me GIROUD confirme la tenue de cette audition et que les procès-verbaux des auditions de MM. PERETTI et BOUVIER sont publiquement accessibles dans la procédure américaine. Elle indique qu'elle le produira cet après-midi dans la présente procédure.

Me BITTON relève que les déclarations de M. PERETTI dans le cadre de cette procédure civile ne sont pas à la présente procédure.

Me BOTTGE souhaite qu'il soit protocolé que Me GIROUD a indiqué que M. PERETTI était "pàdr" pour l'instant.

Dont acte.

**Pour quel motif Samuel VALETTE vous a adressé des mails les 15 et 16 juin 2011 avec une photo, les détails techniques de l'œuvre ainsi que le prix de vente (pièce 2 annexée au pv) ?**

Je ne souhaite pas répondre aux questions qui me seront posées en lien avec tous ces mails vu l'attitude des parties plaignantes qui chercheront le moindre quiproquo dans mes propos et me menace.

Procès-verbal d'audience du Ministère public du 1er décembre 2022
page 5

**Note de la Greffière-juriste :**

Me GIROUD conteste avoir menacé M. PERETTI.

Dont acté.

**Avez-vous perçu une rémunération ou une commission pour votre activité, si oui de quel montant et de qui ?**

Je ne souhaite pas répondre à cette question.

Sur intervention de mon conseil, je réponds que je n'ai reçu aucune rémunération.

**Quel a été votre rôle dans l'acquisition de "Femme de Venise IX" de GIACOMMETTI par BIANCAFLOR puis par ACCENT en octobre et novembre 2011 ?**

Je ne m'en souviens pas.

**Pour quel motif Samuel VALETTE vous a adressé le mail du 12 septembre 2011 (pièce 3 annexée au pv) ?**

Pour les mêmes raisons qu'invoquées précédemment, je ne répondrai pas à cette question.

**Comment expliquez-vous qu'Yves BOUVIER ait déclaré être propriétaire de cette œuvre au moment de sa vente à ACCENT alors qu'ACCENT s'est vue facturer son acquisition par MEI INVEST le 6 octobre 2011 et s'est acquittée du prix le 17 octobre 2011, alors que BLANCAFLOR ne l'a acquise que le 8 novembre 2011 auprès de SOTHEBY'S et ne s'est acquittée du prix que le 10 novembre 2011 ?**

Je ne peux pas vous répondre vu que ce ne sont pas mes sociétés. Il faut poser la question à M. BOUVIER.

**Avez-vous perçu une rémunération ou une commission pour votre activité, si oui de quel montant et de qui ?**

Non, je n'ai touché aucune rémunération.

**Quel a été votre rôle dans l'acquisition de "le domaine d'Arnheim" de René MAGRITTE par BIANCAFLOR et par ACCENT en décembre 2011 ?**

Cela me dit quelque chose pour BIANCAFLOR. M. BOUVIER a acquis ce tableau. Je ne connais pas la société ACCENT.

Sur question, M. VALETTE a présenté ce tableau.

Sur question, je ne me rappelle pas exactement si c'était à moi-même ou à M. BOUVIER également. Ce tableau venait de Belgique. J'ai donné mon avis sur ce tableau à M. BOUVIER comme d'habitude. Il s'agissait d'un chef-d'œuvre. J'ai mis en contact M. VALETTE et M. BOUVIER et ce dernier l'a acquis.

**Avez-vous rencontrer Samuel VALETTE pour discuter de ce tableau ?**

J'ai dû le rencontrer mais je ne me rappelle pas des détails.

P/15776/2017

**Comment expliquez-vous qu'Yves BOUVIER ait déclaré être propriétaire de cette œuvre au moment de sa vente à ACCENT alors qu'ACCENT s'est vue facturer son acquisition par MEI INVEST le 5 décembre 2011 et s'est acquittée du prix le 7 décembre 2011, alors que BLANCAFLOR ne l'a acquise que le 8 décembre 2011 auprès de SOTHEBY'S et ne s'est acquittée du prix que le 9 décembre 2011 ?**

Non, cela ne me dit rien mais je n'y vois rien d'anormal en tous les cas. Je vous explique qu'en Suisse, en tant que marchand d'art, il n'est pas illégal de facturer une œuvre avant de l'avoir acquise.

Sur question, je ne pratique pas comme cela, mais je vous explique qu'il est tout à fait courant que des gens paient une œuvre à un marchand d'art ou à une galerie, en avance, pour l'acquérir des années plus tard.

Sur intervention de Me GIROUD, qui précise que la fin de ma réponse n'a pas été protocolée et sur question de la greffière-juriste qui me demande de préciser la fin de ma réponse, je précise qu'effectivement, il arrive que des gens paient pour des œuvres encore à créer ou déjà existantes.

**Avez-vous perçu une rémunération ou une commission pour votre activité, si oui de quel montant et de qui ?**

Non. Je précise comme je l'ai indiqué précédemment que je ne touchais pas de rémunération au coup par coup. Il est possible que des œuvres m'aient été confiées. Il s'agissait d'échanges de bons procédés.

**Quel a été votre rôle dans l'acquisition de "Nu couché au coussin bleu" d'Amedeo MODIGLIANI par MEI INVEST et par ACCENT ?**

(scan plainte complémentaire p. 273)

Non. Il est possible que j'ai donné un avis.

Sur question, je précise que je donnais souvent des avis, mais les faits commencent à dater et je n'ai plus de souvenirs exacts. Toutefois, cette œuvre me dit bien quelque chose.

**Pouvez-vous indiquez pourquoi et dans quel contexte Bruno VINCIGUERRA vous a adressé le mail du 9 janvier 2015 (pièce 4 annexée au pv) ?**

Ce mail me dit quelque chose. Il est toutefois en anglais et je ne maîtrise pas bien cette langue. Je vois toutefois de quoi il s'agit. Il s'agit d'une proposition de garantie d'une œuvre qui devait appartenir à M. BOUVIER.

Sur question, M. VINCIGUERRA m'a envoyé ce mail certainement parce que c'est moi qui discutait avec lui de cette œuvre à la demande de M. BOUVIER. Ce dernier m'avait demandé de voir quelle garantie il pouvait obtenir en vue de la vente de cette sculpture.

**Avez-vous perçu une rémunération ou une commission pour votre activité, si oui de quel montant et de qui ?**

Non.

Sur question, je précise que je travaille avec ardeur. Avec M. BOUVIER, nous avions et avons toujours une relation amicale, de sorte que nous ne facturions pas toujours nos activités mais il s'agissait d'échanges de bons procédés. Donner un avis ne me prenait souvent que 15 minutes.

P/15776/2017

Case 1:25-mc-00549-VSB-RFT    Document 42-1    Filed 02/13/26    Page 8 of 18
Procès-verbal d'audience du Ministère public du 1er décembre 2022
page 7

Sur question, je précise encore que les documents écrits pour laisser penser que j'ai eu une activité importante, mais ce n'était pas le cas en réalité. Je relève d'ailleurs que je ne répondais pas aux emails.

**Est-ce que l'œuvre d'art Eve de RODIIN vous dit quelque chose ?**

Oui, cette œuvre me dit quelque chose. De mes souvenirs, M. VALETTE m'en avait parlé et j'en ai parlé à M. BOUVIER.

Sur question, l'acquisition de cette œuvre par ACCENT ne me dit rien.

**Pour quelle raison Samuel VALETTE vous a adressé, le 2 février 2012, un mail (pièce 5 annexée au pv) indiquant "*Dites-moi si ça vous va ?"***

Non. Cela ne me dit rien. Je ne pense pas y avoir répondu. Mon conseil indique que j'ai été interrogé sur ce mail dans la procédure civile susmentionnée. Vous me demandez alors comment se fait-il que je me souvenais de ce mail en début d'année et plus aujourd'hui. Mon conseil vous indique que j'ai également répondu, dans ladite procédure civile, ne pas m'en souvenir.

**Avez-vous perçu une rémunération ou une commission pour votre activité, si oui de quel montant et de qui ?**

Non.

**Quel a été votre rôle dans l'acquisition de l'œuvre "Serpent d'eau II" de KLIMT par BIANCAFLOR et ACCENT en septembre 2012 ?**

S'agissant d'ACCENT, je ne sais rien. S'agissant de BIANCAFLOR, j'ai conseillé M. BOUVIER et lui ai dit que c'était un chef-d'œuvre, c'est sûr.

Sur question, lorsque je dis que je l'ai conseillé, je veux dire que je lui ai donné mon avis sur la qualité. Peut-être aussi sur le prix, je ne sais plus. Je précise qu'un chef-d'œuvre n'a pas de prix. Comme tout marchand, Yves BOUVIER me demandait conseil pour avoir un autre avis et être conforté dans son choix.

*L'audience est suspendue à 10h et reprend à 10h20.*

29 août 2012

**Dans un mail du ~~3 septembre 2012~~, Samuel VALETTE vous confirme, ainsi qu'à Yves BOUVIER, un rendez-vous à Vienne le 23 septembre 2012 (pièce 6 annexée au pv). Que quoi s'agit-il? Qui était présent à ce rendez-vous ?**

La date ne me dit rien. En revanche, le rendez-vous, oui. Il est possible que M. BOUVIER était présent au rendez-vous. A cette occasion, je devais me trouver avec M. VALETTE. J'ai visité le musée concernant les œuvres de KLIMT et SCHIELE, ce afin de pouvoir faire une comparaison avec l'œuvre qu'il m'avait présentée, soit "le Serpent d'eau II". Il est possible qu'une copie de cette œuvre se trouvait dans le musée.

Sur question, il n'est pas possible que Ekaterina RYBOLOVLEVA, soit la fille de M. RYBOLOVLEV, était présente au même moment que moi sinon je m'en souviendrais. Je ne l'ai d'ailleurs jamais rencontrée.

Case 1:25-mc-00549-VSB-RFT    Document 42-1    Filed 02/13/26    Page 9 of 18
Procès-verbal d'audience du Ministère public du 1ᵉʳ décembre 2022
page 8

Sur question, à l'occasion de cette rencontre, j'ai surement parlé avec M. VALETTE des prix des œuvres pour faire des comparaisons.

**Pour quelle raison Samuel VALETTE vous adresse, le 17 juillet 2013, "*pour infos*", un mail qu'il a adressé à Yves BOUVIER le jour-même au sujet de la livraison de l'œuvre précitée aux Ports Francs (<u>pièce 7 annexée au pv</u>) ?**

M. VALETTE m'a fait suivre le mail qu'il a adressé à M. BOUVIER car je les avais mis en contact. J'étais toujours en copie. Il s'agit de courtoisie.

Sur question, M. VALETTE m'a fait suivre le mail au lieu de me mettre en copie directement du mail envoyé à M. BOUVIER, car M. VALETTE est mon contact. Je travaille avec lui pour d'autres clients que M. BOUVIER où je suis aussi en copie des mails. M. BOUVIER fait ce qu'il veut de ses œuvres. Je relève encore que je n'ai pas répondu à ce mail.

**Pour quel motif Samuel VALETTE vous a envoyé, le 24 septembre 2013, un mail avec un article d'un magasin autrichien selon lequel SOTHEBY'S aurait vendu le tableau "Serpents d'eau II" pour USD 120'000'000.- (<u>pièce 8 annexée au pv</u>) ?**

BOUVIER l'a acquise pour USD 126'000'000.- et RYBO pour USD 183'800'000.-

Comme je vous l'ai déjà indiqué, je suis toujours en copie.

Vous m'indiquez que ce mail m'est directement adressé comme unique destinataire. Il l'a peut-être envoyé à toutes les personnes concernées qui ont entendu parler de cette œuvre. Je ne sais pas si M. VALETTE l'a également envoyé à M. BOUVIER. Je ne me souviens pas si je l'ai fait suivre à M. BOUVIER ou quelqu'un d'autre, ce dont je suis sûr c'est que je n'ai pas répondu à M. VALETTE.

Sur question, quant à la relation entre M. BOUVIER et M. VALETTE, je réponds qu'il s'agit d'une relation professionnelle de marchand à marchand. Je n'étais pas toujours présent lorsque ces derniers interagissaient entre eux. Je précise spontanément que dans le monde de l'art, il est de courtoisie lorsque vous avez mis en contact des gens, d'être aussi informé du suivi.

Sur question, lorsque vous être apporteur d'affaires pour SOTHEBY'S, vous ne touchez pas de commission à ma connaissance. Personnellement, je n'en ai jamais touchée.

Sur question, de manière générale, chez un autre marchand que SOTHEBY'S il est possible de toucher des commissions. Elles sont déclarées. S'agissant de M. BOUVIER, à ma connaissance, il n'y a pas eu d'autres marchands que SOTHEBY'S en ce qui me concerne, soit que les œuvres pour lesquelles j'ai donné mon avis venaient de chez SOTHEBY'S. Comme déjà indiqué, j'ai consacré un temps minime.

**Avez-vous perçu une rémunération ou une commission pour votre activité, si oui de quel montant et de qui ?**

Non.

**Quel a été votre rôle dans l'acquisition de l'œuvre "<u>Tête</u>" de MODIGLIANI par BIANCAFLOR et ACCENT en septembre 2012 et janvier 2013 ?**

Comme indiqué précédemment, je ne connais pas ACCENT.

Concernant BIANCAFLOR, cette œuvre était un chef-d'œuvre. J'ai eu l'occasion de donner mon avis à M. BOUVIER. J'ai également eu des contacts avec M. VINCIGUERRA (cf pièce 4) au sujet de la garantie.

P/15776/2017

Vous me soumettez un email de M. VALETTE adressé à M. BOUVIER le 25 juin 2012 dont je suis en copie (pièce 9 annexée au pv) et me demandez s'il s'agit de ce que j'ai expliqué précédemment sur l'envoi en copie de mails par courtoisie. C'est exact.

**Le 24 juillet 2012, Samuel VALETTE vous a transféré un mail destiné à Yves BOUVIER, en indiquant *"Voilà le texte"* (pièce 10 annexée au pv). Qu'entendait-il par-là ?**

Il s'agit de son travail de marchand. Il s'agit d'arguments commerciaux, je pense, entre M. BOUVIER et M. VALETTE. Je n'y ai pas répondu non plus. Je reçois des milliers de mails comme cela.

**Comment expliquez-vous que le lendemain, ce même mail ait été envoyé à Yves BOUVIER avec, pour seule modification, l'estimation revue à la hausse de la valeur de l'œuvre (pièce 11 annexée au pv) ?**

Je ne sais pas. Je ne peux pas vous répondre sur des choses dont je ne suis pas au courant. Il faut poser la question à M. BOUVIER et M. VALETTE. Ils seront plus aptes à répondre.

Vous me demandez s'il s'agit d'une préparation d'un mail finalement destiné à M. SAZONOV. Je ne savais pas que ce mail a été envoyé à ce dernier. Je ne connaissais pas son existence à cette époque.

**Pour quelle raison Samuel VALETTE vous envoie, le 1er octobre 2012, un mail contenant une photo de l'œuvre lors d'une exposition en 1912, alors que ladite œuvre a déjà été acquise par BLANCAFLOR (pièce 12 annexée au pv) ?** Date de la facture c'est 25 septembre 2012

A la lecture de ce mail, je constate qu'il s'agit d'une photo prise à l'occasion du salon d'automne de 1912. Il est possible que M. VALETTE me l'ait envoyé car il avait retrouvé cette photo. Il est de coutume de faire des recherches sur les œuvres sur lesquelles nous avons discuté, même après que celles-ci aient acquises par un client.

**Avez-vous perçu une rémunération ou une commission pour votre activité, si oui de quel montant et de qui ?**

Non.

Sur question, il est exact qu'avec Yves BOUVIER nous avons plus procédé par échanges de bons procédés que par le versement de commissions.

**Quel a été votre rôle dans l'acquisition de l'œuvre "Au lit: Le Baiser" de TOULOUSE-LAUTREC par BIANCAFLOR et ACCENT en octobre 2012 et février 2013 ?**

L'acquisition de cette œuvre me dit quelque chose en lien avec SOTHEBY'S et M. VALETTE, il me semble. J'ai certainement dû donner mon avis, mais il ne s'agissait pas de mon artiste préféré.

**Pour quelle raison Samuel VALETTE vous a adressé un mail, le 5 septembre 2012, avec la photo et des informations techniques sur le tableau précité (pièce 13 annexée au pv) ?**

M. VALETTE m'envoyait régulièrement des mails concernant des tableaux à acquérir pour mes clients. Ensuite, je faisais suivre auprès de mes clients, y compris M. BOUVIER qui achetait les tableaux les plus importants et qui était mon ami, mais pas que. Le fait d'avoir M. BOUVIER comme client m'a donné du crédit auprès des maisons de vente telles que SOTHEBY'S et CHRISTIE'S. Je vous explique que plus vous avez des clients qui achètent plus on vous propose des œuvres. La preuve, ma galerie a toujours bien tourné et c'est toujours le cas aujourd'hui, je suis toujours en affaire avec SOTHEBY'S et CHRISTIE'S. Je fais partie des gros contribuables du canton.

**Avez-vous perçu une rémunération ou une commission pour votre activité, si oui de quel montant et de qui ?**

Je n'ai pas touché de rémunération. Il s'agissait là aussi d'un échange de bons procédés.

**Quel a été votre rôle dans l'acquisition de l'œuvre "Le Christ comme Salvator Mundi" de Léonard DE VINCI par BIANCAFLOR et ACCENT en mai 2013 ?**

J'ai tenu le rôle de négociateur à la demande de M. BOUVIER afin qu'il acquiert cette œuvre. A ce titre, j'avais des instructions de M. BOUVIER quant au prix. J'ai eu rendez-vous avec des représentants de SOTHEBY'S, soit M. VALETTE et une autre personne dont je ne me souviens plus le nom, mais qui était, il me semble, responsable des tableaux anciens. Il y avait également une autre personne. Il s'agissait du vendeur qui représentait ses 3 associés. Nous avons été dînés au Bristol (hôtel à Paris).

Selon ses déclarations de 2015 → il serait intervenu pour faire baisser le prix

Sur question, la négociation s'est déroulée pendant le dîner. A la fin de celui-ci, l'affaire était conclue verbalement. Il me semble avoir atteint le prix fixé par M. BOUVIER.

Sur question, lorsque je dis que l'affaire a été conclue verbalement, je veux dire que l'affaire s'est poursuivie par la suite mais je n'étais plus directement impliqué. Il est possible toutefois que j'ai été en copie de mails, mais je ne m'en souviens plus.

Sur question, je n'étais pas informé systématiquement de la suite donnée aux affaires pour lesquelles j'avais donné mon avis ou négocié. J'étais parfois en copie des mails. Même si nous sommes amis avec M. BOUVIER, cela n'empêche pas d'être discret sur nos affaires respectives.

**Avez-vous perçu une rémunération ou une commission pour votre activité, si oui de quel montant et de qui ?**

Non. C'était comme d'habitude un échange de bons procédés, même si cette fois-ci j'ai fait plus que donner un avis. On ne facture pas au tarif horaire.

Sur question, je me suis acquitté des frais de ce repas, lesquelles ont ensuite été remboursés par M. BOUVIER.

Sur question, le remboursement s'est certainement fait en espèces. Je n'ai pas eu à présenter de ticket. Il s'agit seulement de confiance entre amis. Il ne s'agit que de EUR 500.- ou 600.-.

Sur intervention de mon conseil, je précise que lorsque j'indique que je n'ai touché aucune rémunération pour les services rendus à M. BOUVIER dans le cadre des acquisitions susmentionnées, cela inclut également ma société NELOMBOS SA et mon entourage.

**Quel rôle avez-vous joué lors de l'acquisition de l'œuvre "n° 6"de ROTKHO par MEI INVEST et ACCENT en août et septembre 2014 ?**

Toujours la même réponse s'agissant d'ACCENT. Je ne connaissais pas cette société à l'époque.

S'agissant de l'acquisition par MEI INVEST, je vous explique que je connaissais la famille MOUEIX. J'étais très amis avec eux. La fille Charlotte était propriétaire. Son père avait la procuration pour vendre ce tableau. Je vous remets le mandat en ma faveur (pièce 14 annexée au pv). J'avais plusieurs clients dont M. BOUVIER à qui j'ai montré cette œuvre. Ce dernier était très intéressé et a acquis l'œuvre directement auprès de la famille. J'entends par là que l'argent n'a pas passé par moi. Quand il s'agissait de tels montants, nous agissions de cette façon pour éviter des transactions difficiles auprès des banques.

Pour cette opération, ma société a perçu une commission de EUR 4 millions. A la base, cette commission devait être prise en charge par la famille MOUEIX. Finalement, ils ont transigé en ce sens que c'est M. BOUVIER qui s'en acquittait.

Sur question, cette fois-là, j'ai perçu une commission car c'est moi qui avais le mandat de vendre l'œuvre et non SOTHEBY'S. Je précise encore que dans ce cas-là, si je n'avais pas vendu l'œuvre à M. BOUVIER, je pense que je l'aurais vendue à un autre de mes clients. C'est pareil pour SOTHEBY'S, lorsqu'elle ne vendait pas à M. BOUVIER, elle vendait à un autre de ses clients.

Sur question, je précise que j'ai également vendu d'autres tableaux appartenant à cette famille. Je leur ai également acheté une œuvre.

**Un échange de mails du 7 décembre 2012 entre vous, Samuel VALETTE et Grégoire BILLAULT vous est soumis (pièce 15 annexée au pv). Il ressort notamment la phrase suivante: *"Pas sûr qu'il veut mettre cet argent-là"*.**

**Dans quel contexte ces mails ont été échangés ?**

A la lecture de ces mails, je ne sais pas de quelle œuvre on parle, mais certainement pas du ROTHKO n° 6 de la famille MOUEIX car ce tableau a appartenu à la famille depuis toujours.

A la lecture de ces mails, je relève que la provenance du ROTHKO n° 6 indiquée dans le mail de Grégoire BILLAULT du 7 décembre 2012 n'est pas le même que celle du ROTHKO n° 6 appartenant à la famille MOUEIX.

Sur question, je ne sais pas s'il y a eu plusieurs tableaux n°6 de ROTHKO ou s'il s'agit d'un comparatif. Je ne peux rien vous dire de plus sur ces mails.

**Avez-vous le souvenir d'un message que vous aurait adressé Yves BOUVIER en novembre 2014, en indiquant: *"Je suis dans la merdre. Il n'a plus de cash et veut mettre en vente publique tous les Picasso et le Rodin. Il ne comprend pas pourquoi il est le seul à ne pas gagner avec les œuvres [...] en gros je suis mort et ferai mieux de disparaitre. On en parle demain"* ?**

Je me souviens avoir reçu une partie de ce message de M. BOUVIER, soit la partie où il me dit qu'il est dans la merde et qu'il était menacé. Il m'a appelé en tant qu'ami, car il avait peur parce qu'il avait été menacé de mort par M. RYBOLOVLEV.

**Faites-vous encore affaire aujourd'hui avec Yves BOUVIER ?**

Non plus du tout car ce dernier est concentré sur sa défense avec les affaires de M. RYBOLOVLEV. M. BOUVIER a été détruit par cette affaire.

A 11h44, M. BOUVIER et Me BITTON quittent l'audience. Il est demandé à M. BOUVIER de bien vouloir signer le procès-verbal.

P/15776/2017

## Note de la greffière-juriste :

M. PERETTI indique qu'il ne répondra à aucune question de la part des parties plaignantes. Me GIROUD indique qu'elle fera parvenir un courrier au Ministère public sur ce point.

L'audience est donc levée.

**Dont acte,**

Après lecture, persiste et signe à 12h05

P/15776/2017



REPUBLIC AND ET CANTON OF
GENEVA
Judicial Authority
**Public Prosecutor 's Office**

Geneva, Public Prosecutor's Office building, December 1, 2022, at 8 : 40AM

**Clerk-Legal Officer**: Caroline FRÔSCH-DELADOEY

**Clerk**: Marc BERCLAZ

Ref : **P/15776/2017**
To be mentioned in all communications

# MINUTES OF HEARING

<u>Present at the hearing (as per notice of hearing)</u>

**ACCENT DELIGHT INTERNATIONAL LTD,
BOLTON TRUSTEES LTD,
EGEUS INVESTMENTS CORP.,
HOOVER TRADING INVESTMENTS LTD,
JOLLY TIMES INCORPORATED
TALASEA LTD,
TREEHOUSE CAPITAL INC.,
XITRANS FINANCE LTD,**
Plaintiff, duly notified, absent,
Represented by Attorneys Sandrine GIROUD and Benoît MAURON, accompanied by Attorney Nikita OGNIVTSEV;

<u>Present pursuant to a summons to appear</u>

**Mr Yves BOUVIER,**
Identity known and verified
Defendant previously heard, reminded of his rights and obligations,
Assisted by Attorney David Bitton, accompanied by Attorney Edouard Kaiflin.

**Ms Tania RAPPO,**
Identity known and verified, Defendant,
Absente, excused,
Represented by Attorney Pierre-Damien EGGLY;

**Ms. Jean-Marc PERETTI,**
Born on ▮▮▮▮ 1965, art dealer,
Person called to provide information, reminded of his rights and obligations
Assisted by Attorney Didier BOTTGE;

You inform us that today's hearing has been delegated to you by the First Prosecutor **Yves BERTOSSA**, pursuant to Articles 142 para. 1 and 311 para. 1 of the Swiss Code of Criminal Procedure (CPP), and Article 21 of the LaCP.

Minutes of the hearing of the Public Prosecutor's Office of 1 December 2022

**MR BOUVIER**

I take note that I am being heard in the capacity of a defendant.

You inform me that I have the right to refuse to testify and to cooperate. You inform me of my rights pursuant to Articles 107 and 158 of the Code of Criminal Procedure

**MR. PERETTI**

I take note that I am being heard in the capacity of a person called to provide information.

You inform me that I have the right to refuse to testify.

You draw my attention to the possible criminal consequences of false accusation, making a statement that misleads the authorities, or obstructing criminal proceedings (Articles 303 to 305 of the Criminal Code). You inform me of my rights pursuant to Article 158 para. 1 lit. b, c, and d of the Code of Criminal Procedure.

Didier Bottge, my lawyer, is assisting me in the present proceedings. I elect domicile at his/her law office, including for the service of summons.

**Do you confirm your statements to the Geneva police of 12 March 2015 (<u>Exhibit 1 annexed to the police report</u>)?**

Yes, I remember, and I confirm the statements I made on that occasion.

**What is your current professional situation?**

I am still an art dealer. I am still working with my company, NELEMBOS SA.

**When and under what circumstances did you meet Yves Bouvier?**

I met Yves Bouvier in 2007, I believe, in the Saint-Germain-des-Prés district of Paris, in the context of the art world. We associated with the same people. We became friends. I would point out that Mr. Bouvier was a well-known and respected figure in the art world.

**When and on what specific occasions did you work with or for Yves Bouvier?**

Yes. I had the opportunity to work with Yves Bouvier on several occasions concerning a few paintings. It was on a case-by-case basis. We were not partners.

**Did you sell works of art to Yves Bouvier, or did you act as an intermediary/introducer for him?**

It seems to me that I acted for Mr. Yves Bouvier as a business introducer for paintings that had been entrusted to me for sale. It is also possible that I sold paintings for him as well. I also had the opportunity to give my opinion on numerous works of art.

P/15776/2017

Minutes of the hearing of the Public Prosecutor's Office of 1 December 2022

In response to the question, I specify that I gave him my opinion regarding the quality of the works. Mr. Bouvier was not often in Europe. I was somewhat familiar with his tastes. I looked for work on his behalf. I carried out these activities approximately between 2011 and 2015, until the matter involving Mr. Rybolovlev.

**Was your relationship formalized in writing?**

No. It was a friendly relationship.

**Were you remunerated by Yves Bouvier?**

Yes. I was never paid on a fixed basis. Sometimes I received a commission. Sometimes it was an exchange of favors. It allowed me to enter the art world more quickly at a certain level. With regard to the latter statement, I specify that knowing Yves Bouvier served as a business card, insofar as he was a reference in the art world.

**In 2015, you stated that you had received gifts from Yves Bouvier, including an ASTON MARTIN. Was this vehicle the only gift Yves Bouvier gave you, or were there others? Can you detail the gifts received, including dates and occasions?**

It seems to me that this vehicle is the only gift I received from Mr. Yves Bouvier.

Upon further questioning, the commissions I received from Yves Bouvier were paid into my company's account.

**Do you have any interests in Yves Bouvier's companies?**

None. I correct myself: I had interests in the company EUROCENTER, which is not active in the art business.

**Have you met Dmitriy Rybolovlev, and if so, when and under what circumstances?**

Never. I do not know who that is.

**Have you met Mikhael Sazonov, and if so, when and under what circumstances?**

No, I have not.

**Have you met Tania Rappo, and if so, when and under what circumstances?**

No, I have not either.

Upon further questioning, Mr. Bouvier never spoke to me about these three individuals. I only heard about them in the press. I specify that when I say he did not talk to me about them, I mean he did not go into details. I knew he knew Mr.

P/15776/2017

Minutes of the hearing of the Public Prosecutor's Office of 1 December 2022

Rybolovlev, but I did not know what he was doing with him, and it did not concern me.

**Have you met Samuel Valette, and if so, when and under what circumstances?**

Yes. I have known him for a long time, since 2006 or 2007. I know he works at SOTHEBY'S as an art dealer. It is normal that I know him.

P/15776/2017

# AFFIDAVIT OF TRANSLATION

STATE OF NEW YORK   )

                     : ss. :

COUNTY OF NEW YORK )

Louise Grégoire, being duly sworn, deposes and says:

1.    I earned a Master of Laws from the Francis King Carey School of Law in Baltimore, MD, and master's and bachelor's degrees from the University of Tours and Panthéon-Sorbonne, France. I am fluent in both English and French, and I am an attorney admitted to practice in New York.

2.    I hereby certify that this is a true and accurate translation of Exhibit 1 to the Declaration of Mr. Yves Bouvier, the Excerpt of the Minutes of Hearing.

_____

Louise Grégoire

Sworn to before me

This 13 th day of February 2026

_____

Notary Public

CHARLES E. KRAUSCHE
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02KR6066709
Qualified in New York County
Commission Expires November 19, 2029